886 A.2d 112

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Robert E. CAPPELL.

Misc. Docket AG No. 55, Sept. Term, 2004.

Court of Appeals of Maryland.

Nov. 15, 2005.

Fletcher P. Thompson, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Attorney Grievance Com'n of Maryland), for Petitioner.

Robert E. Cappell, Bowie, for Respondent.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, Judge.

The Attorney Grievance Commission, through Bar Counsel and in conformance with Maryland Rule 16–751, filed a Petition for Disciplinary or Remedial Action against respondent, Robert E. Cappell, alleging violations of the Maryland Rules of Professional Conduct (MRPC) 1.15(a), (b), and (c) (Safekeeping Property),[1] and 8.4(b), (c), and (d) (Misconduct).[2] We

---

1. Rule 1.15 provides:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

* * * *

(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or

referred the petition to Judge Cathy H. Serrette, of the Circuit Court for Prince George's County, to conduct a hearing and submit to this Court her proposed findings of fact and conclusions of law.

Judge Serrette conducted a hearing on April 5, 2005, and on May 9, 2005, submitted her findings and conclusions. She concluded that respondent had violated MRPC 1.15(a), (b), (c), 8.4(b), (c), and (d). With regard to mitigation, Judge Serrette found, by a preponderance of the evidence, that "Mr. Cappell was suffering from a major depressive disorder at the time of the misconduct, with a secondary diagnosis of personality disorder." She further found that, "[a]lthough Mr. Cappell understood the wrongfulness of his behavior, but for his illness, Mr. Cappell would not have committed the misconduct, his illness having been the root cause of his wrongdoing." Neither petitioner nor respondent filed exceptions to the judge's findings or conclusions of law.

---

third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(e) When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall promptly distribute all portions of the property as to which the interests are not in dispute.

\* \* \* \*

**2.** Rule 8.4 provides in relevant part:

\* \* \* \*

It is professional misconduct for a lawyer to:

\* \* \* \*

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice.

\* \* \* \*

## BACKGROUND

The facts of this case are not in dispute. Respondent was admitted to the District of Columbia Bar on June 16, 1980, the Maryland Bar on June 4, 1986, and the Virginia Bar in 1992. In addition to his Juris Doctor's degree, he holds a Masters of Law degree in taxation from Georgetown University Law School. While attending undergraduate school, during his sophomore year, he became ill and was diagnosed with and treated for Hodgkin's disease.[3]

He married into a wealthy family in 1987 and apparently had difficulty trying to provide his wife with a comfortable standard of living. In 1993, his wife requested that he move out. She divorced Mr. Cappell in 1995. In 1997, he began a romantic relationship with a woman he had met through his church. At the request of his new lady friend, Mr. Cappell obtained a life insurance policy and named her as the beneficiary. As part of the process to obtain life insurance, Mr. Cappell was tested and learned that he was infected with Hepatitis C,[4] his second potentially-fatal illness. Upon receiving that diagnosis, he obtained medical treatment and took daily shots of interferon.[5] The hearing judge found that respondent "lost his health insurance [coverage], . . . [sought

---

3. Hodgkin's disease is an alternative name for lymphoma [cancer of the lymph nodes], which is "[m]arked by chronic enlargement of the lymph nodes, often local at the onset and later generalized, together with enlargement of the spleen and often the liver, . . . and commonly anemia and continuous or remittent . . . fever." *Stedman's Medical Dictionary* 516 (27th ed. 2000).

4. Hepatitis C is characterized as, "[i]nflammation of the liver, due usually to viral infection, and sometimes to toxic agents." *Stedman's Medical Dictionary* 808 (27th ed. 2000). Hepatitis C is the principal form of transfusion-induced hepatitis, a chronic active form that often develops. *See id.* Acute infection with hepatitis B or C has a higher mortality rate than hepatitis A. *See id.*

5. Medication to induce enzymes, suppress cell proliferation, inhibit viral proliferation, enhance the phagocytic activity of macrophases, and augment the cytotoxic activity of T lymphocytes. "Alpha interferons are used in the treatment of chronic . . . hepatitis C, leukemias, [and] malignant melanoma. . . ." *Stedman's Medical Dictionary* 911 (27th ed. 2000).

treatment at] a homeless shelter clinic [but only obtained] enough medication for a period of five months." Instead of taking the medication, Mr. Cappell prayed for his health to improve. Unable to pay for his own medical necessities, nonetheless, Mr. Cappell managed to pay for groceries and rent for his lady friend and her two children. That relationship, however, ended abruptly when another man moved in with Mr. Cappell's girlfriend, and she and the new gentleman friend decided to get married. Thereafter, Mr. Cappell moved out of his apartment. The hearing judge further found that, in February 1999, "[Mr. Cappell] suffered paralysis of the right side of his face" and was diagnosed with "Bell's [P]alsy." [6] In addition, the hearing judge found that rather than pursue further diagnostic testing or medical care, "[Mr. Cappell] stayed home for several months during which time he took folic acid and antibiotics as his only form of treatment."

In 1997, he began experiencing sleep disturbances and other depression symptoms. Mr. Cappell believed he would die from the Hepatitis C infection. Although he did not follow through with medical treatment, Mr. Cappell indicated that, he "believed that God was punishing him and that God would save him." At times, according to Mr. Cappell, "[h]e felt anxious and agitated and contemplated suicide on a number of occasions." Respondent did not seek psychiatric or psychological assistance of any type. Instead, Mr. Cappell stated that he, "talked to an elder at his church and to God. His church directed him to pray...."

The professional conduct which gave rise to disciplinary charges in Washington, D.C., Virginia, and Maryland began in 1998. A $7,000 check from the Hartford Insurance Company, payable to respondent and his client Ernest Tyrone Williams was deposited by respondent into his Trust Account in August 1998. The check represented payment for a personal injury

---

6. Bell's Palsy causes, "[p]aresis or paralysis, usually unilateral, of the facial muscles, caused by dysfunction of the 7th cranial nerve; probably due to a viral infection; usually demyelinating in type." *Stedman's Medical Dictionary* 1301 (27th ed. 2000).

settlement. Subsequently, respondent properly disbursed from that account a check in the amount of $3,191 representing payment for Mr. Williams's share of the settlement. In addition, respondent drew a check in the amount of $2,333 representing payment for his own attorney fees. The sum of $1,476 should have been held in escrow to pay J. Richard Lilly, MD and Assoc., to cover Mr. Williams's medical expenses. The hearing judge concluded that, in violation of the MRPC, the checks written by respondent and drawn on the Trust Account from October 6, 1998, through June 7, 1999, "were not issued to or on behalf of Mr. Williams or Dr. Lilly, the medical provider, but rather were knowingly drawn by Respondent for his business and personal expenses, or for client matters unrelated to Mr. Williams's claim. . . ." On June 11, 1999, respondent drew a check on his Trust Account, in the amount of $1,476 payable to J. Richard Lilly, MD and Assoc., representing payment for medical services rendered to Mr. Williams.

In addition, respondent deposited a check in the amount of $8,000 from the Continental Insurance Company into his Trust Account on January 21, 1999. Respondent properly disbursed the following checks: check number 1249 to his client, Ms. Herold, in the amount of $2,520.20, representing her share of the settlement proceeds; check number 1258 payable to himself in the amount of $2,000, representing a portion of his legal fees in the case; check number 1266 payable to Howard University Hospital in the amount of $349.90, representing payment for hospital services rendered to Ms. Herold; and check number 1268 payable to Dr. Joseph in the amount of $401.25, representing a partial payment for medical services rendered to Ms. Herold. From January 28 through March 16, 1999, respondent drew checks on the Trust Account for his business and personal expenses or for matters unrelated to Ms. Herold or her claim. Respondent paid the balance due to Dr. Joseph with a cashier's check in the amount of $2,200. From January 28 through March 11, 1999, the balance in respondent's Trust Account was below the amount that should have been there to pay Howard University Hospital, Dr.

Joseph and HCC for the cost of medical records. HCC was never paid its bill of $29.10 from respondent's Trust Account. Respondent's Trust Account was overdrawn on March 19 and 30, 1999.

These instances of misappropriation were the only acts of misconduct reported. There were no prior disciplinary proceedings filed against respondent. Disciplinary proceedings were filed first in the District of Columbia by the District of Columbia Bar Counsel. Maryland and Virginia Bar Counsel followed with separate disciplinary actions.

Judge Serrette found that,

[o]n July 22, 2004, the District of Columbia Court of Appeals ordered that Mr. Cappell be disbarred from the practice of law in the District of Columbia, but that operation of the disbarment be stayed and Mr. Cappell be placed on three-years' probation subject to the conditions imposed by the Board of Professional Responsibility. Those conditions required that Mr. Cappell: 1) not engage in further misconduct; 2) continue to receive regular treatment; 3) be monitored by a financial practice monitor appointed by the Board; and 4) submit quarterly medical and psychiatric reports to the Board. Any failure to comply with medical or psychiatric advice, or violation of any term of probation will subject Mr. Cappell to the revocation of probation and imposition of disbarment.

The District of Columbia Bar notified Maryland Bar Counsel that a disciplinary action had been filed against respondent. On November 16, 2004, Maryland Bar Counsel filed a petition for Disciplinary or Remedial Action in the Circuit Court for Prince George's County, while proceedings were pending in the District of Columbia. It is not clear from the record when the District of Columbia Bar Counsel notified the Virginia State Bar of its disciplinary action against respondent. Shortly after Maryland filed disciplinary proceedings against respondent, and while disciplinary proceedings were pending in Virginia against respondent, Seth Guggenheim, Virginia State Assistant Bar Counsel, recommended to the

Board of the Virginia State Bar Disciplinary System that, "an Order be entered by the Board vacating Mr. Cappell's interim suspension, canceling the currently scheduled hearing date, and dismissing the matter without prejudice." Mr. Guggenheim conferring with Virginia Bar Counsel, Barbara Ann Williams, reasoned that because "Mr. Cappell's license to practice law in the District of Columbia has been neither revoked nor suspended, reciprocal action by the Virginia State Bar is not appropriate. Reciprocal action in Virginia will be appropriate in the event the D.C. Court of Appeals ... revok[es respondent's] license in the District of Columbia because he has not fulfilled the terms of probation in effect in that jurisdiction."

Mr. Cappell's psychiatric history was well documented in the District of Columbia disciplinary proceedings. That history was stipulated to and filed in the disciplinary action in Maryland and found by the hearing judge to have been established by clear and convincing evidence. Judge Serrette found that respondent did not meet with a psychiatrist until the District of Columbia Bar Counsel referred him to Dr. Richard A. Ratner. In addition to Dr. Ratner, D.C. Bar Counsel referred Mr. Cappell to Dr. Thomas C. Goldman for an independent evaluation and Maryland Bar Counsel referred Mr. Cappell to Dr. Joanna Brandt for evaluation in connection with the Maryland disciplinary proceedings. The hearing judge held that, "[a]ll three doctors concluded that at the time of the professional misconduct, Mr. Cappell was suffering from a Major Depressive Disorder, as set forth in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM–IV–TV)." Further, the hearing judge found that, Mr. Cappell "experienced a depressed mood most of the day, nearly every day, and experienced significant sleep disorder [sic], feelings of worthlessness and guilt, [a] diminished ability to concentrate, and thoughts of death or suicide." The hearing judge determined that Mr. Cappell met the criteria for having a personality disorder.

In Dr. Ratner's opinion, "Mr. Cappell's illness caused the professional misconduct" and that "had Mr. Cappell not been

ill, he would not have made the same choices." Dr. Ratner advised the District of Columbia Bar Counsel that "based upon (Mr. Cappell's) conduct throughout this inquiry ... he has hidden nothing and attempted at all times to be as forthcoming as he is able to be, based upon his attitude toward treatment and his following through with it, I feel strongly that Mr. Cappell is not in any danger of recidivism." The hearing judge found that Dr. Goldman's testimony supported Dr. Ratner's diagnosis:

> Dr. Goldman, testifying on behalf of Bar Counsel before the Board of Professional Responsibility of the District of Columbia Court of Appeals, opined that at the time Mr. Cappell committed the offenses, he was barely able to carry on the functions of his life due to the severity of the symptoms of his illness. Dr. Goldman characterized Mr. Cappell as "a person whose functioning was very compromised and a person who would not have done this sort of thing if he was not in a state of significant depression." He cited Hodgkin's Lymphoma, and Bell's Palsy as additional significant medical conditions affecting Mr. Cappell. He concluded, "[t]here is no clear evidence to suggest any antisocial intent (that is to rob or defraud his clients)." Dr. Goldman maintained that while Mr. Cappell is at risk of a future recurrence of depression, it was unlikely that he would again engage in misconduct.

Judge Serrette stated in her findings of fact that, "Dr. Brandt agreed with the diagnosis [of Drs. Ratner and Goldman]. [Dr. Brandt] testified, however, that Mr. Cappell's mental illness had not rendered him utterly debilitated."

The hearing judge concluded that respondent recognized the impropriety of his conduct and that "he has consistently demonstrated remorse and has cooperated with the District of Columbia Board of Professional Responsibility and Attorney Grievance Commission of Maryland."

## DISCUSSION

Respondent admits that he has violated the provisions of Rules 1.15 and 8.4(a), (b), and (c) of the MRPC. Petitioner

recommends disbarment and respondent proposes that we adopt the recommendation of the Maryland Peer Review Panel and impose corresponding discipline similar to the District of Columbia and Virginia.

At the outset we note that this is not a case of reciprocal discipline under Md. Rule 16–773.[7]  Here, Bar Counsel did not wait until disciplinary proceedings in the District of Columbia had concluded before litigating a proceeding in Maryland.  The rules applicable to reciprocal discipline matters are not applicable in situations where the Attorney Grievance Commission does not initiate or process the disciplinary proceeding as a reciprocal discipline matter.  *See Attorney Griev. Comm'n v. Steinberg*, 385 Md. 696, 703, 870 A.2d 603, 607 (2005).  Although, in the present proceedings, Bar Counsel and respondent agreed to a stipulation of the facts entered in the District of Columbia disciplinary proceedings and conducted the hearing on the basis of those previously proven facts, there was no opinion from the District of Columbia Court of Appeals when the present case was docketed in Maryland, and Bar Counsel did not rely on Rule 16–731 in presenting its case.  Even if this were a matter of reciprocal discipline, as to the appropriate sanction we have said that this Court is "inclined, but not required, to impose the same sanction as that imposed by the state in which the misconduct occurred.  We are required to assess for ourselves the propriety of the sanction imposed by the other jurisdiction and that recommended by the Commission." *Attorney Griev. Comm'n. v. Scroggs*, 387 Md. 238, 254, 874 A.2d 985, 995 (2005) (internal

---

7.  Maryland Rule 16–773(e)(3) and (4) provides, in relevant part:

\* \* \* \*

(e) Exceptional circumstances.  Reciprocal discipline shall not be ordered if Bar Counsel or the attorney demonstrates by clear and convincing evidence that:

\* \* \* \*

(3) the imposition of corresponding discipline would result in grave injustice;

(4) the conduct established does not constitute misconduct in this State or it warrants substantially different discipline in this State. . . .

citations omitted). Thus, the disciplinary proceedings conducted in the District of Columbia, including the sanction imposed, while relevant to our consideration of this case, are not entitled to the same weight as if this were a proceeding pursued as a reciprocal discipline matter.

In addition, matters which took place at the Peer Review Panel hearing are relevant in this case only because respondent raises the matter of the Panel's recommendations in support of his argument for the appropriate disposition. Ordinarily the conduct of the Peer Review Panel is confidential and inadmissible in any proceeding. *See* Md. Rule 16–723(a) (Confidentiality of peer review meetings). The Peer Review Panel met and recommended to Bar Counsel that because respondent's misconduct "occurred when [he] was acting under both mental and physical disabilities," as supported by the uncontradicted medical testimony, he "should not be disbarred[,] but[,] his actions should be monitored in a manner similar to that imposed by the D.C. Board on Professional Responsibilities."

In *Attorney Griev. Comm'n v. Lee,* 387 Md. 89, 108, 874 A.2d 897, 908 (2005), in discussing the Peer Review process, we pointed out that the "process features a panel of … attorneys and … non-attorney[s], that make[ ] a preliminary determination as to whether formal charges should be filed against the respondent attorney." Judge Harrell writing for the Court explained:

[T]he Peer Review Panel proceeding is an informal, nonadversarial meeting designed to allow Bar Counsel, the respondent attorney, the complainant, and other invited persons to meet and discuss the issues presented in the complaint in an environment similar to a mediation process. … The Panel is not governed by any formal rules of evidence, but must respect lawful privileges. …

The purpose of the Peer Review Panel is not principally to make recommendations as to the appropriateness of formal charges. …

If a Peer Review Panel concludes that the complaint has a substantial basis indicating the need for some remedy, some behavioral or operational changes on the part of the lawyer, or some discipline short of suspension or disbarment, part of the peer review process can be an attempt through both evaluative and facilitative dialogue, (A) to effectuate directly or suggest a mechanism for effecting an amicable resolution of the existing dispute between the lawyer and the complainant, and (B) to encourage the lawyer to recognize any deficiencies on his or her part that led to the problem and take appropriate remedial steps to address those deficiencies. The goal, in this setting, is not to punish or stigmatize the lawyer or to create a fear that any admission of deficiency will result in substantial harm, but rather to create an ambience for a constructive solution. The objective views of two fellow lawyers and a lay person, expressed in the form of advice and opinion rather than in the form of adjudication, may assist the lawyer (and the complainant) to retreat from confrontational positions and look at the problem more realistically. [Committee note to Rule 16–743(a).]

If, however, after hearing statements, the Panel determines that the Statement of Charges "has a substantial basis and that there is reason to believe that the [respondent] attorney has committed professional misconduct or is incapacitated, the Panel may ... make an appropriate recommendation to the Commission or ... inform the parties of its determination and allow the attorney an opportunity to consider a reprimand or a Conditional Diversion Agreement." The Panel is authorized to recommend to the Commission that either a Petition for Disciplinary or Remedial Action be filed, the Statement of Charges be dismissed, or that a Conditional Diversion Agreement or reprimand is appropriate. Although the purpose of the Panel proceeding is not to generate any formal findings of fact, the Panel must accompany its recommendation with "a brief explanatory statement."

*Lee,* 387 Md. at 108–09, 874 A.2d at 908–09 (internal citations omitted).

In the present case, the Peer Review Panel considered Bar Counsel's evidence against respondent and concluded that there was a substantial basis for a finding that respondent violated Rules 1.15, 8.4(b), 8.4(c), and 8.4(d) of the MRPC; that respondent admitted the conduct; and that there was a substantial basis for mitigation in the punishment imposed in these violations. The Panel asked Bar Counsel to consider entering into a Conditional Diversion Agreement with respondent because "respondent was acting under a severe disability at the time of the misappropriation as a result of the breakdown of his marriage, problems with the IRS and mental and physical disabilities." In the Panel's view, a similar sanction to that imposed in the District of Columbia could be achieved in a diversion agreement and would be appropriate because of the mitigating evidence in this case. Bar Counsel declined that invitation indicating that it was not authorized to enter into such an agreement. Assistant Bar Counsel explained during oral argument in this case that, in light of Bar Counsel's duty to investigate complaints of misconduct and our decision in *Attorney Griev. Comm'n. v. Vanderlinde,* 364 Md. 376, 773 A.2d 463 (2001), diversion agreements are inappropriate in matters involving misappropriation of client funds or other dishonest conduct. Because, for reasons to be explained, *infra,* we believe Bar Counsel and therefore the Commission may have misinterpreted the scope of Md. Rule 16–736, we shall remand this case for reconsideration.

Effective July 1, 2001, the Maryland Rules of Practice and Procedure, for the first time contained a conditional diversion rule. Md. Rule 16–736. *See Attorney Griev. Comm'n v. Olver,* 376 Md. 650, 652, 831 A.2d 66, 67 (2003). Rule 16–736 provides, in part:

(a) When Appropriate. Upon completing an investigation, Bar Counsel may agree to a Conditional Diversion Agreement if Bar Counsel concludes that:

(1) the attorney committed professional misconduct or is incapacitated;

(2) the professional misconduct or incapacity was not the result of any wilful or dishonest conduct and did not involve conduct that could be the basis for an immediate Petition for Disciplinary or Remedial Action pursuant to Rules 16–771,[8] 16–773,[9] or 16–774; [10]

(3) the cause or basis of the professional misconduct or incapacity is subject to remediation or resolution through alternative programs or mechanisms, including (A) medical, psychological, or other professional treatment, counseling, or assistance, (B) appropriate educational courses or programs, (C) mentoring or monitoring services, or (D) dispute resolution programs; and

(4) the public interest and the welfare of the attorney's clients and prospective clients will not be harmed if, instead of the matter proceeding immediately with a disciplinary or remedial proceeding, the attorney agrees to and complies with specific measures that, if pursued, will remedy the immediate problem and likely prevent any recurrence of it.

---

**8.** Rule 16–771, titled "Disciplinary or remedial action upon conviction of crime," requires Bar Counsel to file a Petition for Disciplinary or Remedial Action in the Court of Appeals when it learns and verifies that an attorney has been convicted of a serious crime. The Rule further provides that, after a hearing, this Court may suspend the attorney from the practice of law until final disposition of the disciplinary or remedial action if it determines that the attorney has been convicted of a serious crime.

**9.** Rule 16–773 addresses reciprocal or inactive status cases in which, "[a]n attorney who in another jurisdiction (1) is disbarred, suspended, or otherwise disciplined, (2) resigns from the bar while disciplinary or remedial action is threatened or pending in that jurisdiction, or (3) is placed on inactive status based on incapacity...."

**10.** Rule 16–774 involves attorneys "summarily placed on inactive status for an indefinite period if the attorney has been judicially determined to be mentally incompetent or to require a guardian of the person for any of the reasons stated in Code, Estates and Trusts Article, § 13–705(b), or, in accordance with law, has been involuntarily admitted to a facility for inpatient care treatment of a mental disorder."

We said in *Olver*, "that the purpose for promulgating the diversion rule was to give Bar Counsel and the Commission the flexibility to resolve or remediate certain kinds of misconduct or incapacity, without resort to the full panoply of resources required for resolution of formal disciplinary proceedings." *Id.* at 658, 831 A.2d at 71. The Committee note to Rule 16–736 provides some examples of conduct that may be appropriate for conditional diversion:

Examples of conduct that may be susceptible to conditional diversion include conduct arising from (A) unfamiliarity with proper methods of law office management, record-keeping, or accounting, (B) unfamiliarity with particular areas of law or legal procedure, (C) negligent management of attorney trust accounts or other financial matters, (D) negligent failure to maintain proper communication with clients, (E) negligent failure to provide proper supervision of employees, or (F) emotional stress or crisis or abuse of alcohol or other drugs.

In *Olver*, we focused our discussion on the specific types of impairments which would qualify attorneys for the conditional diversion program. In that regard, Chief Judge Bell, writing for the Court, said:

This case seems to fall within the Rule, to be the kind of case that the Court had in mind when it approved a diversion alternative to be administered outside of, and without the supervision of, judicial proceedings—the Comment to Rule 16–736(a) lists "emotional stress or crisis or abuse of alcohol or other drugs" as an "[e]xample of conduct that may be susceptible to conditional diversion."

*Olver*, 376 Md. at 656, 831 A.2d at 70. Although the hearing judge in *Olver* had made factual findings and drew conclusions of law, we elected not to consider the merits of the proceedings and remanded the case to the Attorney Grievance Commission in order for Bar Counsel to determine whether to propose a conditional diversion agreement or inactive status. *See Olver* at 659, 831 A.2d at 71–72.

In *Olver*, however, we considered the testimony regarding the attorney's mental disorder and the hearing judge's factual findings pertaining thereto. *Id.* In our discussion of the attorney's alleged misconduct which the hearing court concluded violated Rules 1.1, 1.3, 1.4, and 8.4(d), we placed considerable emphasis on the attorney's misconduct stemming from his mental illness or infirmity. Mr. Olver's misconduct was characterized by Bar Counsel's witness, a board certified general psychiatrist and forensic psychiatrist, as "Major Depression, a chronic illness, punctuated by episodes of severe depression, and a Personality Disorder, 'a lifelong condition resulting in the [lawyer] experiencing persistent and consistent interactions that will get the patient into difficult situations....' " *Olver* at 657, 831 A.2d at 70. Bar Counsel acknowledged that Mr. Olver was "unable to render adequate legal services by reason of mental illness or infirmity." *Id.* Moreover, the doctor in *Olver* "concluded that the [attorney's] mental condition caused him to act as he did in his representation of the complainant ... that [Olver wa]s not capable of rendering adequate legal services." *Id.* The psychiatrist, however, pointed out that if Mr. Olver took "his medication, remain[ed] in psychiatric therapy and [was] supervised weekly, he may be able to practice." *Olver*, 376 Md. at 657, 831 A.2d at 70–71.

In remanding this case for consideration of conditional diversion, we placed substantial emphasis on Mr. Olver's mental impairment rather than on his professional misconduct. We acknowledged that the hearing judge concluded that Mr. Olver violated Rule 8.4(d)—conduct prejudicial to the administration of justice and that Mr. Olver's alleged misconduct was characterized as "unusual and strange." *Olver*, 376 Md. at 657, 831 A.2d at 70. In characterizing the nature of Mr. Olver's misconduct, we relied upon allegations in the complaint that "the petitioner indicated that the respondent's 'unusual and odd behavior ... stemmed from one or more psychiatric disorders' " and that "... respondent was 'unable to render adequate legal services by reason of [his] mental illness or infirmity.' " *Id.*

Similarly, in the present case, the hearing judge found that Mr. Cappell's alleged misconduct was prejudicial to the administration of justice. Unlike Mr. Olver, however, respondent's alleged misconduct violated Rule 8.4(b) and (c). Although Mr. Cappell's conduct involved allegations of dishonesty and misappropriation of client funds, under the circumstances, the present case is not materially different from the circumstances in *Olver* since Mr. Cappell's misconduct "was the root cause of his wrongdoing." The District of Columbia Court of Appeals and the hearing judge in this case concluded that, at the time of his misconduct, respondent suffered from a mental disorder, and but for that illness the misconduct would not have occurred. The hearing judge found from the evidence that respondent was depressed most of the day, nearly every day, and was unable to concentrate. As explained by Dr. Goldman, the psychiatrist engaged to give an independent psychiatric examination, "[t]he depression contributed substantially to [Mr. Cappell] getting into a tight cash-flow situation and also impaired his ability to come up with more adaptive solutions to the bind, and to make an accurate assessment of the risk he was incurring in acting as he did." Although, Dr. Brandt, who was engaged by Maryland Bar Counsel to give a psychiatric examination, concluded that Mr. Cappell's mental impairment did not result "in his utter inability to conform his conduct in accordance with the law and the [MRPC]." Dr. Brandt stated that Mr. Cappell suffered "from symptoms of Major Depressive Disorder at the time of his misconduct," and that the "symptoms included depressed mood, sleep disorder, diminished interest in activities, feelings of hopelessness and suicidal ideation," which impaired to some extent his social and occupational functioning.

In attorney disciplinary matters, conditional diversion[11] is a disposition to be distinguished from that of impos-

---

11. Rule 16-712(b)(3) grants Bar Counsel the authority to "enter into and implement Conditional Diversion Agreements...." We acknowledged in *Attorney Griev. Comm'n v. Harlan*, 320 Md. 571, 580, 578 A.2d 1196, 1200 (1990), that Bar Counsel exercises prosecutorial discretion

ing a sanction. When deciding the issue of whether conditional diversion is appropriate, the initial question for Bar Counsel is whether the filing of a disciplinary or remedial action is necessary. Upon completion of an investigation, Bar Counsel may, among other dispositions, recommend to the Commission either the approval of a Conditional Diversion Agreement or the immediate filing of a Petition for Disciplinary or Remedial Action. *See* Rule 16–734.[12] Neither Bar Counsel nor the Commission is required to determine the appropriate sanction or predict which sanction we might impose on the merits. The issue of assessing the appropriate sanction to be imposed after review of the merits of a disciplinary action is a matter left solely to the province of this Court. *Attorney Griev. Comm'n v. Kent*, 337 Md. 361, 653 A.2d 909 (1995); *see also* Md. Rule 16–721(a) (sanctions imposed by the Court of Appeals include disbarment, suspension or reprimand).

---

in the performance of his duties. *See also Attorney Griev. Comm'n v. Fezell*, 361 Md. 234, 250, 760 A.2d 1108 (2000) (noting that Bar Counsel is empowered, *"inter alia*, to investigate all matters involving possible misconduct called to his attention and to prosecute disciplinary cases"). Not unlike a prosecutor, Bar Counsel, in the performance of his duty, does not act in a purely ministerial capacity. His function involves the exercise of discretion. *See Brack v. Wells*, 184 Md. 86, 40 A.2d 319 (1944) (noting generally that the State's Attorney institutes any particular prosecution as a matter of discretion) (internal citations omitted).

12. Rule 16–734. Procedure upon completion of investigation.
Upon completion of an investigation, Bar Counsel shall take one of the following actions:
(a) recommend to the Commission dismissal of the complaint or termination of the proceeding without discipline, with or without a warning, in accordance with Rule 16–735;
(b) recommend to the Commission approval of a Conditional Diversion Agreement signed by Bar Counsel and the attorney in accordance with Rule 16–736;
(c) recommend to the Commission a reprimand in accordance with Rule 16–737;
(d) file with the Commission a Statement of Charges with an election for peer review in accordance with Rule 16–741; or
(e) recommend to the Commission the immediate filing of a Petition for Disciplinary or Remedial Action, with or without collateral remedial proceedings in accordance with Rules 16–771, 16–773, or 16–774.

An attorney may be eligible for conditional diversion when his or her professional misconduct was not the result of any wilful or dishonest conduct; the cause or basis of the misconduct can be resolved through remediation or alternative programs or mechanisms; and the disposition is in the best interest of the public and the attorney's clients both present and prospective. *See* Rule 16–736. Accordingly, consistent with the eligibility requirements of conditional diversion,[13] and Rule 16–736(a)(2), Bar Counsel could have concluded, in this case, that Mr. Cappell's misconduct was not solely "the result of any wilful or dishonest conduct." Moreover, in our view, the hearing judge's factual findings tend to cast doubt on whether respondent's misconduct was wilful and intentionally dishonest. Although respondent appeared to concede facially at every level of the disciplinary process that he knew his conduct was wrong, the medical evidence supports the hearing

---

13.  Eleven other states and the District of Columbia (Rule XI, Section 8.1) have adopted diversion programs: Alabama (Rule 8(h)), Arizona (Rule 55), Colorado (Rule 251.13), Kansas (Rule 203(d)), Louisiana (Rule XIX, Section 10(A)(9)), Nevada (Rule 105.5), New Hampshire (Rule 37A(g)), New York (Rule 691.4(m)), Oregon (Rule 2.10), Wisconsin (Rule 22.10), and Wyoming (Section 14, Disciplinary Code). Some states have adopted other non-disciplinary proceedings the equivalent of diversion programs: Delaware (Rule 9(b)(2)(C)), Florida (Rule 3-5.1(b)(2)), Georgia (Rule 4–102(b)(5)), Hawaii (Rule 2.3(a)(6)), Michigan (Rule 9.106(6)), Missouri (Rule 16.01), New Jersey (Rule 1:20–14(a)), and Texas (Rule 2.14(C)). Generally, the jurisdictions do not allow participation in a diversion program where "the misconduct is severe, or involves theft of client funds, dishonesty, fraud, or deceit, or where the attorney has been previously disciplined (or has previously entered into a diversion program)." *See* Kristy N. Bernard & Matthew L. Gibson, *Current Development, Professional Misconduct By Mentally Impaired Attorneys: Is There A Better Way to Treat An Old Problem?*, 17 GEO. J. LEGAL ETHICS 619 (2004) ("Diversion Programs assist attorneys while preserving the public's trust, and thereby conform to the goals of discipline").

The exception to the general rule of ineligibility for participation in the diversion program because of serious misconduct is found in the Wisconsin Rule. That Rule specifically provides, however, that if good cause is shown an attorney can participate in the diversion program even if his or her misconduct involves misappropriation of client funds. In Oregon, in addition to the general rule, the exception specifically provides for participation in the diversion program if the attorney's misconduct is the result of a mental condition.

judge's conclusion that, during the time of Mr. Cappell's misconduct, his cognitive abilities were substantially impaired.

Mental impairment is a mitigating factor and may tend to negate the wilful or intentional nature of an attorney's misconduct. *Attorney Griev. Comm'n v. Hayes*, 367 Md. 504, 789 A.2d 119 (2002) (stating that a hearing judge's factual findings with regard to mitigating factors tended to negate any dishonest or fraudulent intent); *Attorney Griev. Comm'n v. Tomaino*, 362 Md. 483, 498, 765 A.2d 653, 661 (2001) (noting that "the state of mind of the attorney at the time of the violation [is] 'important in the context of mitigation' "); *Attorney Griev. Comm'n v. Sheridan*, 357 Md. 1, 29, 741 A.2d 1143, 1158 (1999) (noting that the state of mind at the time the [attorney] violated the [disciplinary] rules is important in the context of mitigation); *see State ex rel. Oklahoma Bar Ass'n. v. Southern*, 15 P.3d 1, 7 (Oklahoma 2000) (finding no willful or voluntary misconduct in behavior of an attorney with a severe, untreated vitamin B–12 deficiency which impaired his short-term memory and exasperated his depression). In light of our construction of Rule 16–736, conduct involving "emotional stress or crisis or abuse of alcohol and drugs ... may be susceptible to conditional diversion." Because of our interpretation of the eligibility requirements of Rule 16–736, an attorney may be eligible for conditional diversion even in situations where his or her conduct is allegedly wilful or dishonest.

The *Vanderlinde* standard of mitigation is a separate standard and is not a factor in deciding whether a case qualifies for disposition under Rule 16–736. It does not preclude the Attorney Grievance Commission or Bar Counsel from entering into conditional diversion agreements. The *Vanderlinde* standard should not be determinative of the Commission's or Bar Counsel's decision to enter or not to enter into conditional diversion.

Recently in *Attorney Griev. Comm'n v. James*, 385 Md. 637, 870 A.2d 229 (2005), we held that disbarment was the appropriate disciplinary sanction for an attorney's misappropriation of client funds and other misconduct. Our decision to disbar

the attorney had no bearing, and, should have had no bearing on the Commission's or Bar Counsel's decision to enter into conditional diversion with Mr. James. In that case, two complaints were filed against Mr. James for professional misconduct. Apparently after the first complaint, but before the second complaint, Bar Counsel and Mr. James entered into a Conditional Diversion Agreement, on November 18, 2002. *James*, 385 Md. at 646, 870 A.2d at 234–35. After approximately 18 months, however, Mr. James was found to have violated the agreement. *Id.* After revocation of the agreement, we transmitted the matter to this Court to hear the charges contained in the pleadings, pursuant to Rule 16–757. *Id.* Thereafter, Bar Counsel filed a Petition for Disciplinary or Remedial action against Mr. James. The matter came for hearing before a judge of the Circuit Court for Prince George's County who made findings of fact and conclusions of law concluding that Mr. James violated the MRPC, 1.1, 1.3, 1.4, 1.15(a), 8.1(b) and 8.4(a), (c), and (d); Md. Rule 16–604, 16–607, 16–609; and §§ 10–304 and 10–306 of the Business Occupations and Professions Article. *James*, 385 Md. at 662, 870 A.2d at 244. Bar Counsel charged Mr. James with violating different sections of the MRPC in each complaint. *Id.*

Only the complaint involving allegations that Mr. James misused his attorney escrow account between January 2000 and August 2001 is relevant to our discussion. Bar Counsel charged Mr. James with violating MRPC 1.1, 1.15(a), 8.4(a) and (d), Rules 16–607 and 16–609 and Business Occupations and Professions Article §§ 10–306 and 10–307. The facts which support the allegations of misappropriation and commingling of trust money predated the Conditional Diversion Agreement entered into on November 18, 2002. Although, the attorney's misconduct involved misappropriation and commingling of trust money, he could have been but was not charged with violating Rule 8.4(c) (acts of dishonesty).

The hearing judge found that in January 2000, Mr. James intentionally stopped using his personal account and started using his attorney escrow account for personal and business

matters. *James*, 385 Md. at 648, 870 A.2d at 236. For example, on January 10, 2000, Mr. James wrote escrow check number 1063 to Directv, representing a personal expenditure. *Id.* On June 18, 2001, Mr. James's escrow account had a negative running balance of $38.39. This was apparently due to his overpayment by $10 to his client, Shelia Smith, of her portion of the proceeds from an arbitration award and a bank fee of $30 assessed for insufficient funds. *Id.* On June 19, 2001, Mr. James deposited $8,000 into his escrow account on behalf of his client, Catherine A. Davis. He mishandled Ms. Davis's $8,000 settlement by failing to maintain her money in tact due to several negative account balances which went below the amount of monies he was suppose to hold in trust for the client. The net proceeds of Ms. Davis's settlement ($1,774.75), which Mr. James held in escrow, fell below that amount on at least three occasions. *Id.* On April 22, 2002, three of Mr. James's escrow checks were presented to his bank for payment and "[a]ll three checks caused an overdraft in a combined total amount of $70." *James*, 385 Md. at 648, 870 A.2d at 236.

The hearing judge concluded that "[Mr. James's] mishandling of his escrow account and his failure to keep Ms. Davis's monies intact until disbursed [were] prejudicial to the administration of justice in violation of Rule 8.4(d)." *James*, 385 Md. at 649–650, 870 A.2d at 236. Upon our review of the case, we determined that "Mr. James misappropriated Ms. Davis's funds in escrow ... and ... use[d] client funds for personal purposes." We pointed out that "[i]ntentional [m]isappropriation, by an attorney, of funds entrusted to [an attorney's] care 'is an act infected with deceit and dishonesty.' " *James*, 385 Md. at 665–66, 870 A.2d at 246. By comparison, Mr. James's behavior in handling his escrow account was not materially different than Mr. Cappell's behavior in handling his escrow account. Both cases involved attorneys failing to keep client funds in tact until they were disbursed and using client funds for personal purposes. Although Mr. James was not charged with violating Rule 8.4(c), his handling of his escrow account,

specifically the misappropriation of client funds, involved wilful and dishonest acts in violation of that Rule.

For whatever reasons, in *James,* Bar Counsel and the Commission opted to attempt resolution of the matter first by conditional diversion. We were not privy to that decision. In making that decision, however, Bar Counsel and the Commission were not required to predict what our disposition might have been on the merits of the case prior to entering into conditional diversion. Bar Counsel and therefore the Commission had the benefit of Rule 16–736 and its own discretion to enter into conditional diversion. It appears that in *James,* Bar Counsel was not guided by the *Vanderlinde* standard of mitigation and entered into an agreement with Mr. James for conditional diversion notwithstanding our holding in *Vanderlinde.* Because it was determined that Mr. James had violated the agreement, it was appropriate in accordance with the Md. Rules, that the matter was brought to our attention for disciplinary action.

In *Vanderlinde,* we held:

In cases of intentional dishonesty, misappropriation cases, fraud stealing, serious criminal conduct and the like, we will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and the MRPC.

364 Md. at 413–14, 773 A.2d at 485 (emphasis in original); *Attorney Griev. Comm'n v. Christopher,* 383 Md. 624, 648–49, 861 A.2d 692, 706 (2004) (finding compelling extenuating circumstances when an attorney's severe major depression and alcoholism were the root cause of his misconduct and resulted in his utter inability to conform his conduct in accordance with the law and the MRPC). *See also Attorney Griev. Comm'n v. Alsafty,* 379 Md. 1, 17–18, 838 A.2d 1213, 1223 (2003) (stating that before *Vanderlinde* and post *Vanderlinde* we continue to recognize "a distinction between intentional conduct, as in

*Vanderlinde* ... and negligent or unintentional conduct") (internal citations omitted). In those situations where we have applied the *Vanderlinde* standard, it was after a determination on the merits and for the purpose of imposing a sanction. We have never said that satisfaction of the *Vanderlinde* standard is a necessary precondition for conditional diversion. Rule 16–736(b) contains the eligibility requirements for conditional diversion. Based upon our construction of that rule, if there is competent evidence presented from which Bar Counsel and therefore the Commission may conclude that an attorney's unprofessional conduct was not solely the result of wilful or intentionally dishonest conduct, conditional diversion may be an appropriate disposition. Because Bar Counsel believed that our decision in *Vanderlinde* precluded respondent's eligibility for conditional diversion, we decline to consider the merits of these proceedings at this time. We remand this case for the Attorney Grievance Commission and Bar Counsel to reconsider entering into a Conditional Diversion Agreement even though disciplinary proceedings have begun.

**IT IS SO ORDERED.**